Allen, J.
In the year 1774, Byrd and others conveyed to Joshua Storrs certain lots of land in the town of Richmond, containing four acres. This property, I understand from the facts in the record, was situate on both sides of E or Main street, and was bounded on the east by Shockoe creek.
On the first of September 1786, Samuel Coleman and Susanna his wife, who was a daughter and devisee of Joshua Storrs, by their deed conveyed to Didier Collin that portion of the lot of land aforesaid, situate on the south or lower side of Main street. The deed describes it as beginning on the bank of Shockoe creek, in a line of Main street, and as bounded by Main street, a line at right angles back from the street to an alley, down the alley to Shockoe creek, thence up the creek to the beginning.
Collin entered upon the lot so conveyed to him, occupied a house situate upon a portion of it, and so far as the case shews, was in the actual exclusive occupation of the whole lot up to the boundaries described in *247 his deed. This possession continued uninterrupted, so far as the testimony shews, until the first day of January 1806, when by his deed of that date, Collin conveyed forty feet of the ground in his possession to Willimn and John Miller ; reserving an annual rent of forty pounds per annum. The Millers being about to build on this lot of forty feet, a claim to a part of it seems to have been set up by Richard Adams, Mrs. Byrd and others, all claiming under the original grant to Byrd. It was contended that after the deed of Byrd to Storrs, the creek had been diverted from its original channel by the erection of a bridge across Main street, in consequence of which, land on the eastern side of the creek had been united to the lot originally conveyed to Collin, and to which, therefore, it was maintained, his deed gave him no title. On this claim being made, Collin and the Millers entered into the agreement of the 6th March 1806; which after reciting that Collin had by the deed of January 1806, conveyed to the Millers a piece of ground, part of the same Collin then held and occupied, the claim set up to a part of the ground by Adams and others, provides that the Millers should be liable only for payment of rent for so much of the ground conveyed to them as they should actually occupy at the rate of 20 shillings a foot. And the agreement then further provides that in case Collin shall by any means hereafter become entitled to all or any part of the ground adjoining that so leased to the Millers, lying between Shockoe creek and the said Millers, that then, and in that case, the said Millers shall and may be at liberty to take, and Collin bound himself to lot them have so much of the ground as they should choose to take at the rate of one pound per foot. This agreement, it is argued, shews that Collin did not then consider himself as entitled to, or in possession of the disputed ground, and merely looked to a future acquisition of the title. I do not so construe the instrument. It expressly sets out that the forty feet *248 conveyed to Millers was part of the ground Collin now holds and occupies. The claim of Adams and others embraced part of these forty feet, and the agreement so hir modified the deed as to exempt the Millers from the Payraent the ground rent on so much of the forty feet as they should not actually have, occupy and possess. The Millers were at liberty to take so much of the residue between the ground occupied by them and the creek at the same rates; and the expression that in case the said Collin should by any means thereafter become entitled to the ground between the part leased to the Millers and the creek, did not contemplate any subsequent acquisition of title from others, but referred to his claim under his then existing title. Notwithstanding the doubts created by the claim of Adams and others, the agreement itself recites that the Millers were clearly of opinion Collin’s title was the best. But they wished to avoid controversies, and therefore entered into the agreement. The title they clearly thought to be best, was the title then held by Collin. The claim, however, by Adams and others, threatened a controversy, and the expression in the agreement, taking all the instrument together, is equivalent to the expression that if it should appear Collin was entitled to the land. That the possession and occupation of Collin extended to a portion of the ground now in controversy is manifest even from the pretensions of the appellants. He had actually enclosed and cultivated a portion of the ground for a flower garden. The testimony shews that as far as the ground was susceptible of use and occupation, except for building purposes, he did so use and occupy it. The low swampy land below on the immediate margin of the creek could not be cultivated, but he extended his enclosure into this ground, protecting the land so enclosed from the water at high tides and during freshets, by a palisade and embankment and a row of poplars. The agreement indicates no intention on the part of Collin *249 to abandon a possession thus held and claimed under his deed from Coleman and wife; a possession never disturbed or broken by the actual entry of any adverse claimant. Under this agreement the Millers took possession, and as suited their convenience erected tenements. The agreement did not convey the title to the ground. It was an executory contract binding Collin to let the Millers have the land on the terms specified. In the mean time the legal title so far as the Millers were concerned, remained in Collin ; and as no deed has been as yet executed by Collin, so far as the record discloses, that legal title still remains in Collin's heirs. The possession of the Millers taken under the agreement, constituted the Millers the tenants of Collin. Their possession was his possession; and whatever may have been the validity of his title originally, such possession held under a claim of title, and continued without interruption for a sufficient length of time, would mature into a perfect title against all adverse claimants.
The nature of the possession held by the Millers, is, as against the appellants, conclusively established by the articles of agreement between Richard Adams and the Millers of the 31st July 1814. That agreement recites a previous parol agreement between the same parties, which the evidence tends to shew must have been entered into shortly after the agreement between Collin and the Millers in 1806. We know nothing more of the terms of this parol agreement than the written agreement discloses, and must therefore presume the written contract embodies the original parol agreement. By that contract, Richard Adams agreed to lease to the Millers all that piece or parcel of ground on the south side of the market bridge over Shockoe creek, on the western boundary thereof, beginning at the southwest arch of the bridge, and running in a western direction, to the line of Didier Collin, upon E street, and extending back the depth of the lot now occupied by the Millers under *250 the deed of Collin of January 1806, and the agreement of March 1806, both of record, at the rate of twenty shillings a foot, for so many feet as Adams should establish an indefeasible title in fee simple unto, upon the sa^ street> an<^ running back the depth aforesaid. This recital shews that they were contracting for the ground bounded by the creek on one side, and the line of Didier Collin’s lot on the other side, embracing all the ground in controversy, including as well the ground conveyed by Collin, by his deed of January 1806, as that referred to in the agreement of March 1806,‘ and that the lot was occupied by the Millers under the deed and agreement of Collin. And if any doubt could arise as to what the parties meant by this part of the agreement, it is entirely removed by a subsequent clause inserted for the purpose of clearly indicating what the parties were contracting about. That clause is in these words: “ It is further understood and agreed, by and between the parties hereto, that these articles of agreement are intended to secure unto the said Millers, in the possession and right of the lot they now claim under the deed from Didier Collin and wife aforesaid, and are intended only for the event that the claim of the said Adams to the said property should be found prior in obligation to the title from D. Collin and wife, under which the Millers now claim and hold.”
It will not do to argue that this clause should be restricted to the forty foot lot embraced by the deed of January 6, 1806. For if that be so, as it is expressly provided that the articles were intended to secure the possession and title of said lot, and are intended only for the event that Adams’ title to the said property should be found superior to Collin’s, under which they claimed and held, it would follow there was no agreement by which the Millers agreed to lease the residue of the ground in controversy; and the whole foundation upon which the appellants rest their case for specific execution would *251 fail them. The articles of agreement apply as well to the residue of ground as to the forty foot lot, or they do not. The clause of the agreement last referred to, expressly confines its operation to the lot held and claimed under Collin; and if this was no more than the forty feet, then there is no agreement whatever respecting the residue, no contract to enforce, and the appellants have misconceived their case. But the whole difficulty arises from the use of the word deed in the singular number in this clause. The previous clause shewed that the Millers occupied the whole ground to the creek under two deeds from Collin and wife. The lot so described as an entirety, was that of which they desired to secure the title, in the event of Collin’s title proving defective, and the last as well as the first clause must be understood as referring to the entire lot held under Collin. Both clauses so treat it. In the first it is described as being occupied under the deeds of Collin, and in the last they declare the articles were only intended to secure their possession and right of the lot held under Collin, and though deed is used instead of deeds, it applies as well to the agreement of March 1806 as to the deed of January previous; both were executed by Collin and wife, both are recorded, and both are styled deeds in a previous part of the articles.
We then have the case in which Collin, claiming under a deed which purported to convoy ground bounded on one side by a creek, enters upon and holds possession of the land up to this natural' boundary, exercising all those acts of ownership over it which the condition of the property and his own convenience made expedient. A portion of it he conveys by deed, and enters into a contract binding himself to lease the residue to the Millers. The Millers claim to hold under him ; and Adams¡ at the time of entering into the contract which is the foundation of this suit, is apprised of the fact that the Millers claim and hold under Collin, and is referred to *252 the deeds of record, which disclose the nature of their claim.
Even if the point whether the creek has actually changed its channel since the deed from Coleman and wife, of the 1st of September 1786, was freer from doubt than the evidence makes it; still, whatever change was made, or however brought about, whether the result of slow and gradual and imperceptible accretion, or caused suddenly by the erection of both or either of the bridges, Collin is seen holding to the creek as his boundary, and his possession remains undisturbed.
It is vain to contend, in the face of the articles of 1814, that the Millers first took possession of the disputed ground by virtue thereof, and is therefore to be considered as holding under Adams. It was probably a matter of indifference to the Millers to whom they paid the rent, provided they were secured in their possession. They desired to render the property productive by building upon the ground. Their agreement with Collin of the 6th March 1806, shewed they thought the title of Collin was the best; but to secure themselves against contingencies, they entered into the contract with Adams to pay him the same rent, should he establish a better title. But they did nothing to compromit the title of their landlord. To have done so, would have been acting in bad faith; and therefore, on the face of their contract with Adams, they set out that they hold and claim under Collin; and this Adams, by becoming a party to the deed, admits to be the fact.
In this state of things, how is it possible for a Court of Equity to investigate and determine, as between Collin and Adams, which has the legal title. Collin relies on his deed and possession under it. Whether the boundaries of the deed embraced the land in controversy or not, or whether there has been an actual, exclusive and continued possession in Collin and those holding under him, are questions which Collin cannot be called on to *253 litigate in equity. He rests upon his legal title, whethor acquired by deed, or disseisin under colour of his deed, and actual continued possession: and a Court of Law is the appropriate forum to determine upon the validity of his claim. The articles of agreement between Adams and the Millers, create no equity against Collin ; he was a stranger to them. And it would not seriously be contended, that an executory contract between a tenant and third person, setting up a claim to the leased premises, by which the tenant agrees to purchase of this claimant, should he establish a good title thereto, will give a Court of Equity jurisdiction as against the landlord to investigate and decide upon the validity of his legal title.
Until Adams has shewn he has a clear title, he has no right to call for a specific execution of the contract. This he could only do by establishing the superiority of the title he sets up, to that by which Collin and his representatives have heretofore held and still hold the actual possession, through their tenants claiming under the executory agreement of March 1806. The agreement between Adams and the Millers, looked to some proceeding by which the former was to shew a better title than the one derived from Collin; or, in the words of the agreement, that his claim was prior in obligation to the title of Collin, under which the Millers then claimed and held. There could have been no difficulty in proceeding at law. The freehold being in Collin, he would have been the proper tenant to the praecipe in a writ of right; and the parties in possession, claiming to hold under the executory agreement with Collin for a lease, could have been sued in ejectment. Nor do I conceive that such suit against the tenants in possession, would have been a disaffirmance of the articles of 1814; or that such articles would have interposed any impediment to the action. If the Millers had entered and held possession under these articles, the authority of *254 Newby v. Jackson, 8 Eng. C. L. R. 126, might have some application ; hut when the articles upon their face disclose, that so far from so entering and holding under Adams, they claimed and held under an adverse title; a£1<^ s0 far from surrendering the possession under this adverse title, the articles were to be inoperative until Adams established a better title, they could not surely interpose the articles to defeat the action commenced to try the validity of the title under which they held ; or contend that a verdict and judgment establishing the superiority of the title of Adams, disaffirmed an agreement providing for that contingency and inoperative until it occurred.
The obligation to establish a better title to the premises has not been complied with by Adams. On the contrary, the first step a Court of Equity is asked to take, is, to investigate a question of boundary upon the depositions of witnesses, to pronounce upon the legal effect of the conveyance to Collin, and to determine upon the effect of the adverse possession held by Collin and his tenants. It seems to me, these are investigations, which, as between Collin and Adams, a Court of Equity, under the circumstances of this case, has no right to make; and that, until these questions are settled, the appellants had no right to ask for a specific execution of the articles of 1814.
If, by the delay, a claim originally valid, (but which on the proofs, I should consider very questionable,) has now, by the lapse of time and the statute of limitations, been irretrievably lost, the appellants must impute the loss to their own laches. Adams, by his agreement, assumed the burthen of shewing a superior title to that of Collin, and if he intended to insist on the contract, good faith required of him promptitude and dispatch.
I think the decree dismissing the bill was correct and should be affirmed.
*255 Baldwin and Daniel, J’s concurred in the opinion jy -r i Ait of Judge Allen.